UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

NIGEL SAUNDERS,

                              Plaintiff,

       -against-                                          1:17-CV-0765 (LEK/CFH)

PATRICIA RYAN, *et al.*,

                              Defendants.

_____

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

        On July 13, 2017, pro se plaintiff Nigel Saunders commenced this action against

defendants Patricia Ryan, Jason Russell, and Tai Arnold, employees of the State University of

New York, Empire State College, School for Graduate Studies (the "University"). Dkt. No.1. In

Plaintiff's amended complaint, Dkt. No. 20 ("Amended Complaint"), the operative pleading, he

asserted claims under the Americans with Disabilities Act ("ADA") and the New York State

Human Rights Law ("NYHRL"). See Dkt. No. 27 ("September 2018 Memorandum-Decision and

Order") at 7. Plaintiff supplemented the Amended Complaint with certain additional allegations

included in the initial complaint. See Dkt. No.1 ("Complaint") at 12–13; Sep. 2018 Mem.-

Decision and Order at 1.

        Before the Court is Defendants' motion for summary judgment. Dkt. Nos. 50 ("Motion");

50-2 ("Defendants' Statement of Material Facts" or "Defendants' SMF"); 50-80 ("Defendants'

Memorandum of Law"); 80-4 ("Saunders Deposition I"); 80-5 ("Saunders Deposition II"); 80-6

("Saunders Deposition III");[1] 80-9 ("Ryan Affidavit"); 80-47 ("Russell Affidavit"); 80-78

("Arnold Affidavit"). Plaintiff filed a response in opposition. Dkt. Nos. 53 ("Plaintiff's

Memorandum of Law"); 53-1 ("Plaintiff's Statement of Facts" or "Plaintiff's SMF"); 53-2

("Plaintiff's Supplemental Statement of Facts" or "Plaintiff's Supplemental SMF").[2] Defendants

filed a reply. Dkt. Nos. 54 ("Response to Plaintiff's Statement of Material Facts" or "Response

to Plaintiff's SMF"); 54-1 ("Durand Declaration"). For the reasons that follow, Defendants'

Motion is granted in its entirety.

II.     **BACKGROUND**

    **A. Factual History**

Below, the Court details the facts as recounted by the parties, while noting any factual

disputes. The relevant events took place between the spring of 2008, when Plaintiff began

studying at the University, and the summer of 2014, when he was dismissed from his program of

study. See Saunders Dep. II at 9, 23; Russell Aff., Ex. 30.

    *1. Plaintiff's Disability*

Plaintiff has type 2 diabetes and hypertension, for which he takes multiple prescribed

medications. See Pl.'s SMF at 1, 3–6; Response to Pl.'s SMF ¶¶ 1–4. In his deposition, Plaintiff

noted that he sometimes has episodes, without warning, in which he develops a headache,

sweats, and feels tired. See Saunders Dep. II at 86–87. When these episodes happen, he has to sit

---

    [1]  Defendants deposed Plaintiff on three different days. Because Defendants failed to upload the transcript for first day of the deposition, the Court does not rely on any portion of "Saunders Deposition I" to which Defendants cite in their supporting papers.

    [2]  Plaintiff labels Dkt. No. 53-2, which consists largely of factual assertions, as an "affidavit." Because the document is not signed and notarized, the Court characterizes the document instead as a supplemental statement of facts.

2

down, monitor his blood pressure, measure his blood sugar, and take medication. Id. at 87. When he is at work, these episodes sometimes require a brief break, and sometimes require him to leave work. Id. at 88.These episodes occur with some frequency, but not every day. See id. at 87.

### 2. The University's Academic Requirements

Academic years at the University are divided into three terms—Fall, Spring and Summer. Ryan Aff. ¶ 11. The Fall and Spring terms are each fifteen to sixteen weeks long, while the Summer term is eight weeks long. Id.

Graduate programs at the University are designed for students who study part-time, meaning that they take two courses per term. Id. Students have flexibility to acquire course credits at their own pace, within certain guidelines. Graduate students must take at least six credits per calendar year and must complete a degree in their program of study within six years. Id. Students also must maintain a grade point average of 3.0 or higher. Id. ¶ 16. A student in "academic warning status," that is, whose grade point average ("GPA") dips below 3.0 and remains under 3.0 for at least six additional credits, is subject to academic dismissal by the Dean of Graduate Studies. Id. ¶ 17.

Under "extenuating circumstances," a student may ask an instructor to issue an "incomplete" ("IN"), provided that the student completed at least fifty percent of the course work before the end of the term. Id. ¶ 18. If a student failed to complete the required course work and does not otherwise qualify for an IN, she will receive a grade of "no credit" ("NC"), which factors into her GPA as a zero. Id. When Plaintiff enrolled in 2009, a student who received an IN had sixteen weeks to complete one hundred percent of outstanding work for the course, but by the time he was dismissed in 2014, that number had been reduced to fifteen

3

weeks. Id. ¶ 19.

All Master of Arts programs at the University culminate in a final project. Id ¶ 15. A final project can take the form of a research-oriented project, such as a thesis, or a practicum, in which a student immerses in a work site. Russell Aff. ¶ 3. Before a graduate student at the University may start her final project, she must submit a final project proposal ("FPP") that is approved by a "first reader," usually a professor, by the chair or coordinator for her program of study, and by the Dean of the Center for Graduate Programs. Ryan Aff. ¶ 46; Russell Aff. ¶ 4.

### 3. *Plaintiff's Academic History and the "Modes of Inquiry" Course*

Plaintiff enrolled in the University's Labor and Policy Studies master's degree program (the "Master's Program") in the spring term of 2008 and was terminated from the Master's Program in the summer of 2014. See Saunders Dep. II at 9, 23; Russell Aff, Ex. 30. Throughout this period, Ryan and Russell worked at the University, Ryan as the Director of Graduate Student and Academic Services, and Russell as the instructor of the "Modes of Inquiry" course and the coordinator for the Master's in Work and Labor Policy program. Ryan Aff. ¶ 1; Russell Aff. ¶¶ 1,5. Arnold served as the Acting Dean of Graduate Studies between August 2012 and March 2014 and as the Dean of Graduate Studies between March 2014 and June 2016. Arnold Aff. ¶ 1.

When Plaintiff began the Master's Program, the program contemplated a five-term, or two and a half-year course of study, composed of thirty-six credits. Ryan Aff. ¶ 14. By the time Plaintiff was dismissed in 2014, the Master's Program included a sixth term, with a two-part, six-credit course in the final term, but still required a total of thirty-six credits. Id. ¶ 13. By the time he was dismissed, Plaintiff had completed twenty-eight credits. Saunders Dep. II at 24. Plaintiff alleges that the only requirements he had left to fulfill at the time of his dismissal were the Modes

4

of Inquiry course and a final paper. See Compl. at 12.

Early on in his Master's Program, Plaintiff had a series of legal battles with the University. On August 14, 2008, Ryan sent an "academic warning letter" to Plaintiff advising him that his GPA had fallen below 3.0 and that if he failed to raise his GPA he would be subject to dismissal. See id. ¶ 23, Ex. 3. Plaintiff failed to do so and accordingly was sent a letter by Dean R.J. Clougherty on March 16, 2009 informing him that he was being dismissed from the Master's Program. Id. ¶ 30, Ex. 6. On December 29, 2009, Plaintiff filed a complaint with the New York State Division of Human Rights ("DHR"), in which he alleged that he was improperly denied a reasonable accommodation in the form of extra time to complete several courses in which he had received NCs. See id., Ex. 8. DHR ultimately dismissed Plaintiff's complaint upon a finding of no discrimination, see id., Ex. 10; but in the interim, the University had reinstated Plaintiff and granted him extra time to complete one of the courses in question. See id., Ex. 9.

Plaintiff missed the initial extended deadline for this course, claiming that he had lost the course assignments in a flood. Id. ¶ 38. When he submitted what the professor regarded as substandard work at the second extended deadline, he received an NC. Id. ¶ 39. After Plaintiff lost an academic appeal regarding this grade, he filed a second complaint with DHR, alleging that he received an NC in that course in retaliation for filing the 2009 complaint. See id. ¶ 43, Ex. 14. Plaintiff and the University entered into a settlement agreement, without DHR making any finding with respect to the alleged retaliation. See id. Pursuant to this agreement, whose terms the parties have not described to the Court, Plaintiff apparently was permitted extended time accommodations to be applied to individual assignments as warranted. See Russell Aff. ¶ 45; Ryan Aff., Ex. 18 at 8.

5

Plaintiff first registered for the "Modes of Inquiry" course, in which students in Plaintiff's Master's Program formulate and prepare their FPPs, in the Summer 2010 term, which ran from May 17, 2010 to July 9, 2010. Russell Aff. ¶ 10. Based on Russell's experience, he states that many students are unable to complete this course within a 15-week term, let alone an 8-week summer term. Id. ¶ 12. In anticipation of late submissions, he advised students in the Summer 2010 term class that if they wished to submit work for Russell to review after the end of the term, they were required to send him an e-mail to notify him that they had submitted the work. Id. Russell recounts that ninety-five percent of students in the course that term who made late submissions followed these instructions, but that Plaintiff sent an e-mail notifying him of a late August 27, 2010 submission on October 19, 2010. Id. ¶ 14. In this e-mail, Plaintiff did not indicate that he required an extension for reasons related to a disability or otherwise mention his medical conditions. See id., Ex. 2. Rather, he advised Russell that he "had 16 weeks to review [Plaintiff's] work and notify [him] of any modifications [Russell] would like by electronic mail" and stated, "I wish to discuss this matter with you further because my future as a graduate student is important to me." Id.

To "give[] Plaintiff the benefit of the doubt," Russell agreed to give Plaintiff an IN for the course, and to extend his time to complete the course to December 23, 2010, permitting him to continue working on drafts of his proposal until it was acceptable. Id. ¶ 16. In response to an e-mail to Plaintiff in which Russell granted this extension request, Id., Ex. 4, Plaintiff mentioned a "pending disability discrimination charge against Empire State College which includes several medical conditions which I have developed several years ago and the need for extra time to complete some of my studies," and stated, "I hope you and I will have a good understanding of

the situation so that I can finish this program once and for all." Id., Ex. 5.

On October 25, 2010, Russell sent Plaintiff an e-mail providing instructions on how to complete the course assignments, steps that Russell describes as components of a standard process required for all students in the course, as set forth in a "course contract" provided to students. Id. ¶ 21, Ex. 6. Russell specified the following steps, which correspond to the course's three sequential assignments: (1) engaging in a "back and forth discussion . . . which will lead to a choice of a viable research topic or practicum site"; (2) developing an FPP, with accompanying "back and forth discussion, revising and rewriting"; and (3) writing "a first draft of a chapter or section of" the FPP, which entails "doing research and background reading." Id., Ex. 6 at 2. In this same e-mail, Russell informed Plaintiff that Russell was waiving the third step. Id. Russell also included an additional two pages of instructions. See id., Ex. 6 at 2–4.

Plaintiff did not contact Russell again until December 2, 2010. Id. ¶ 24. On that day, Plaintiff sent Russell an e-mail informing Russell that Plaintiff had "tak[en] so long to respond" because he was "not feeling well"; that he chose "Gender in the workplace" as a final project topic; and that he would like to take a course called "Human Resources and Policy Studies I" in the Spring 2011 term. Id., Ex. 7 at 2.[3] In Russell's view, "[t]his in no way conformed to the anticipated requirements for" step one of the process he described in his October 25, 2010 e-mail. See id. ¶ 25. Russell asked Plaintiff if he wanted further assistance in refining his topic, see

---

[3] In this e-mail, Plaintiff provided two sentences elaborating on his topic idea: "Gender in the workplace has many interesting areas to explore including topics such as gender discrimination in the workplace, gender identity in the workplace, gender equality and inequality in the workplace, gender communication in the workplace and so many other important topics in this area. Women and minorities suffer more adverse effects because of their gender than men of all other races which includes lower salaries, promotions and benefits." Id.

id., Ex. 7 at 3, and received what he characterizes as a non-committal response. See id. ¶ 25 ("Although Plaintiff indicated that he appreciated the offer, he did not elaborate or indicate what he wanted help with.").

On December 9, 2010, Plaintiff stated in an e-mail to Russell, "I am getting very nervous because I have not heard from you and my deadline is near." Id., Ex. 7 at 4. Russell responded on December 10, 2010, stating, "Before I can provide you with assistance, I need you to tell me what help you would like. To expedite things, it would be best for you to formally present your topic in a final project proposal." Id., Ex. 7 at 5. He provided a bulleted list of nine actions that this task would entail, including "Indicate what type of Final Project you are doing"; "Review some of the existing literature on this topic"; "Discuss how your research will fit into the exiting literature"; and "Describe how your Final Project will be organized (number of chapters)." See id.

On December 19, 2010, when Plaintiff next contacted Russell, Plaintiff e-mailed a file that contained a 10-page paper. See id., Ex. 8. On December 20, 2010, Russell provided some comments on the paper by e-mail. See id., Ex. 9. Russell noted, for instance, that the purpose of the paper was too broad to cover in a final project, and suggested a more "manageable" topic based on something discussed on the seventh page of the paper; indicated that Plaintiff needed to reference more research sources; and directed Plaintiff to specify what type of final project he proposed to do (i.e. a thesis, a position paper, or a case study). See id. In Russell's view, "Plaintiff's submission . . . did not demonstrate significant effort, did not meet the course requirements, and was not Master's level work." Id. ¶ 30.

On December 23, 2010, at 5:40 AM, Plaintiff e-mailed Russell a revised paper. Id., Ex.

10 at 2. Russell replied this same day with an e-mail in which he stated "I do not see how you have adjusted your Final Project proposal to meet the suggestions that I gave to you. Indeed, I see no major differences between the files that you send [sic] on December 20 and December 23. This proposal still requires much more work." Id. Later the same day, at 8:34 PM, Plaintiff sent a further revised paper. Id., Ex. 11 at 6. Initially, Russell responded fifteen minutes later with an e-mail informing Plaintiff that Russell could not open the file, that Plaintiff was required to have submitted the FPP by 4:30 PM that day, in an "acceptable" form, and that because Plaintiff had not met that requirement, he would not receive credit for Modes of Inquiry nor receive any further extensions. Id., Ex. 11 at 5. Plaintiff replied an hour later with an e-mail in which he protested, "[t]his is not fair," and to which he attached the file in a different format. Id., Ex. 11 at 4. Russell responded with an e-mail confirming that he would not grant Plaintiff credit for the course or permit further extensions, and detailing certain deficiencies in the FPP that rendered it incomplete. Id., Ex. 11 at 3.

Plaintiff later attempted to re-register for Modes of Inquiry, for the Summer 2012 term. Russell Aff. ¶ 34. By Russell's recollection, Plaintiff did not submit the first of three class assignments, which was supposed to be two or three pages in length, and "did not bother to engage in the process of topic exploration." See id. Russell submitted the second assignment, the FPP. See id. Specifically Plaintiff submitted an FPP on a new subject: "Lesbian, Gay, Bisexual, and Transgendered Labor and employment issues," on June 20, 2012. Id., Ex. 12 at 4. Russell returned the FPP with edits by e-mail on July 1, 2012. Id., Ex. 12 at 2. In that e-mail, Russell included some recommendations for improving the paper, noting, for instance, that Plaintiff should narrow the focus of his research in one of a few suggested ways. See id. Plaintiff

responded by e-mail on July 3, 2012, stating that he would return the paper with the suggested changes "as soon as possible," and requesting permission to enroll in a course called "Final Project." See id., Ex. 12, at 2. Russell responded by e-mail the same day, informing Plaintiff that completing an FPP and obtaining the required approvals of the FPP were prerequisites for enrolling in "Final Project." See id.

On July 14, 2012, which was after the end of the Summer 2012 term, Plaintiff sent Russell a rewritten FPP, without having asked for an extension or requested an IN grade. See id. ¶ 36, Ex. 14 at 2. Russell attests that he "would not have accepted Plaintiff's 7/14/2012 submission, or given him credit for the course," due to a variety of defects in the FPP. Id. ¶ 36. Nevertheless, there had been an error in Plaintiff's Summer 2012 registration that had rendered that term "a nullity," and Plaintiff accordingly was permitted to register to retake the class in the Fall 2012 term. See id. ¶ 37, Ex. 15.

In the Fall 2012 term, Plaintiff took two courses—Policy Studies II and Modes of Inquiry, both with Russell. Id. ¶ 38. On November 9, 2012, Plaintiff sent an e-mail to Arnold's office informing Arnold that Plaintiff had been displaced from his home due to Hurricane Sandy after he lost a portion of his roof in the storm, but that he had since returned home. See Ryan Aff. ¶ 62; Russell Aff., Ex. 19 at 4; Arnold Aff. ¶ 7. Plaintiff requested some form of hurricane-related extra time accommodation, the details of which are not clear from the evidentiary record. See Ryan Aff. ¶ 65; Russell Aff., Ex. 19 at 5. Russell initially believed that Plaintiff had requested an extension exclusively with respect to assignments for Policy Studies II and accordingly granted extension requests for that course only. See Russell Aff. ¶ 39. Ryan ultimately intervened, informing Russell on January 11, 2013 that the University was "bending over backwards" to

assist Hurricane Sandy victims, and instructing Russell to grant Plaintiff an IN for Modes of

Inquiry, even though Ryan was "sure it's not deserved." See Russell Aff., Ex. 18 at 6. In his

deposition, Plaintiff testified that while "some of the siding was removed" from his house during

the hurricane, his house did not endure any flooding or other damage, and he did not lose any

school-related documents. See Saunders Dep. III at 35.

Around the same time, before Russell granted Plaintiff's hurricane-related

accommodation request, Plaintiff sent Russell an e-mail informing him, "I have an existing

agreement with Empire State College and the New York State Division of Human Rights

concerning extended time to complete my studies because of my medical issues." See Russell

Aff. ¶ 45, Ex. 19 at 2. Ryan confirmed that pursuant to the referenced settlement agreement, the

extended time agreement applied to individual assignments as warranted, and stated that a

disability-related accommodation was not justified in that instance. See Ryan Aff., Ex. 18 at 8.

Ryan concluded, however, that "the storm accommodation overrides the disability

accommodation." Id.

For the Fall 2012 term Modes of Inquiry course, Plaintiff ultimately submitted one of the

three assignments, namely the FPP. See Russell Aff. ¶¶ 42–43. Plaintiff initially sent the FPP,

which was on a new topic, "The State of Labor in Modern America," on November 20, 2012. Id.

¶ 42. On November 24, 2012, Russell responded by e-mail, asking Plaintiff to re-send the file in a

different, readable format. See id. On December 24, 2012, Plaintiff forwarded a new file from a

third party, in Microsoft Word format. See id., Ex. 17 at 3. Russell forwarded the submission to

Ryan by e-mail and stated that the submission seemed "somewhat suspect," as the attachment

was initially sent by someone else and that person appeared to be the most recent editor of the

11

file. See id., Ex. 17 at 5. It is not clear if or how Russell's plagiarism inquiry ultimately was resolved. See id.

Initially, Russell had intended to give Plaintiff an NC for the class; and Russell informed Plaintiff as much on January 10, 2013. See Russell Aff. ¶ 44. But On January 11, 2013, pursuant to Ryan's instructions, Russell informed Plaintiff by e-mail that he would receive an IN for Modes of Inquiry and an extension until April 12, 2013 to complete the course work. See id., Ex. 19 at 6. Later in January, Russell and Plaintiff had an e-mail exchange in which Russell communicated to Plaintiff certain steps he would have to take to complete the course requirements for Modes of Inquiry. See id., Ex. 20. Notwithstanding the April 12 extended deadline, the next time Plaintiff contacted Russell was on July 1, 2013, when Plaintiff informed Russell by e-mail that he had been unable to complete the required assignments, because he "went overseas and got sick." See id. ¶ 47, Ex. 21 at 3.

Russell made arrangements with Ryan for Plaintiff to re-take Modes of Inquiry in the Fall 2013 term. See id., Ex. 21. Plaintiff e-mailed an FPP to Russell on August 1, 2013, before the term began, to which Russell responded on September 27, 2013, recommending certain changes. See id., Ex. 22. Plaintiff only submitted one of the assignments that term, the FPP, one week before the end of the term, on December 13, 2013. See id. ¶ 51. Russell reviewed the submission and informed Plaintiff by e-mail on January 8, 2014 that the FPP needed certain changes, such as a narrowing of the paper's focus, before it could be approved. See id., Ex. 23. Russell granted Plaintiff an IN and an extension until April 11, 2014 to complete the required course work. See id. ¶ 52. On January 9, 2014, Plaintiff sent an e-mail to Russell asking to change the topic of his FPP to "Gay and Transgender issues," to which Russell responded by informing Plaintiff that

since he began the Master's program six years ago in the spring of 2008, he was approaching the six-year limit to complete the program. See id., Ex. 24.

On April 16, 2014, after the extended deadline had passed, Plaintiff submitted an FPP on a new topic, "Issues on Assisted Living and Future of Health Care for the Elderly." See id. ¶ 55, Ex. 25. Russell responded by e-mail with some recommended changes and reminded Plaintiff that he was nearing the six-year deadline to complete the Master's Program, which would pass at the end of the spring. See id., Ex. 25. On April 28, 2014, Plaintiff e-mailed Ryan to request an extension of this six-year deadline. See id., Ex. 27. Plaintiff submitted a re-written FPP to Russell on May 6, 2014. See id. ¶ 57.

On May 9, 2014, Ryan e-mailed Plaintiff to inform him that the University was waiving the six-year time graduation time limit, on certain conditions. See id., Ex. 27. First, Plaintiff had to obtain the required approvals of his FPP by July 18, 2014. See id., Ex. 27 at 2. Second, once Plaintiff satisfied that condition, he was required to complete Master's Program requirements, which included passing the oral defense for the Final Project, by May 1, 2015. See id.

To help Plaintiff finish the FPP on time, Ryan connected Plaintiff with a writing coach in late May of 2014. See id. ¶ 60, Ex. 28. Plaintiff subsequently met with the writing coach on two or more occasions. See id., Ex. 28 at 8–9; see also Saunders Dep. III at 92 (noting that he met with the writing coach "a couple times").

Plaintiff ultimately did not satisfy the first condition of the graduation time limit waiver. On July 15, 2014, Plaintiff e-mailed Russell and Ryan to inform them that he would not be able to complete his FPP by the July 18, 2014 deadline due to "a medical problem," and attached a file that Plaintiff represented was a letter written by his doctor. See id., Ex. 29. This typed letter

reads, "Mr. Saunders, Nigel is under my care. At present his medical condition is considered as not satisfactory. It will be appreciated if his final paper proposals can be post deferred until next month (August 15, 2014)." See id. Defendants describe this letter as "suspect looking," since it contains typographical errors and is not on official letterhead. See Defs.' Mem of Law at 10; Russell Aff. ¶ 63.[4] After an e-mail exchange among Arnold, Ryan, and Russell in which all agreed that an extension of the July 15, 2014 deadline should not be granted, Ryan sent Plaintiff an e-mail on July 18, 2014 denying his extension request. See Russell Aff., Ex. 30.

Plaintiff does not contest the authenticity of any of Defendants' documentary evidence or dispute any aspect of Defendants' factual account, except that he defends the authenticity of the July 15, 2014 doctor's note. See generally, Plaintiff's SMF; Plaintiff's Supp. SMF; Saunders Dep. III at 105.

### B. Claims

Subsequent to the Court's September 2018 Memorandum-Decision and Order partially granting Defendants' motion to dismiss, the following claims remain: (1) ADA reasonable accommodation claims against all defendants in their official capacities; and (2) NYHRL reasonable accommodation claims against all defendants in their individual capacities. See Sep. 2018 Mem.-Decision and Order at 10–17. He requests damages, as well as injunctive relief in the form of reinstatement to the Master's Program. See SAC at 4.

### III.  LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure instructs courts to grant summary

---

[4] The "h" in "his" is written in pen, and a word is crossed out with pen between "At" and "present." See id.

judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, while "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.; see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991) ("Only when no reasonable trier of fact could find in favor of the nonmoving party should summary judgment be granted.").

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Similarly, a party is entitled to summary judgment when the nonmoving party has failed "to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

In attempting to repel a motion for summary judgment after the moving party has met its initial burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Hence, "a court's duty in reviewing a motion for summary judgment is 'carefully limited' to finding genuine disputes of fact, 'not to deciding them.'"

Macera v. Vill. Bd. of Ilion, No. 16-CV-668, 2019 WL 4805354, at *8 (N.D.N.Y. Sept. 30, 2019)

(Kahn, J.) (quoting Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d

Cir. 1994)).

## IV.   DISCUSSION

### A.  Standards

Title II of the ADA provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such

entity." 42 U.S.C. § 12132. A plaintiff can establish a violation by demonstrating that he has been

denied a reasonable accommodation necessary in light of his disability to enable his "meaningful

access" to a program or service. See B.C. v. Mount Vernon Sch. Dist., 837 F.3d 152, 158 (2d Cir.

2016) ("Exclusion or discrimination may take the form of disparate treatment . . . or failure to

make a reasonable accommodation."); Henrietta D. v. Bloomberg, 331 F.3d 261, 280 (2d Cir.

2003) ("A 'reasonable accommodation' is one that gives the otherwise qualified plaintiff with

disabilities 'meaningful access' to the program or services sought.") (quoting Alexander v.

Choate, 469 U.S. 287, 301 (1985)). A plaintiff must (1) establish that he has a qualifying

"disability," (2) demonstrate that he lacks access to a given government resource due to his

disability, and (3) suggest a plausible accommodation to remedy that lack of access. See Meekins

v. City of New York, N.Y., 524 F. Supp. 2d 402, 407 (S.D.N.Y. 2007). A plausible

accommodation is one "the costs of which, facially, do not clearly exceed its benefits." Henrietta

D., 331 F.3d at 280 (quoting Borkowski v. Valley Cent. Sch. Dist., 63 F.3d 131, 138 (2d Cir.

1995)).

The third prong entails a burden-shifting framework. See Wright v. New York State Dep't of Corr., 831 F.3d 64, 76 (2d Cir. 2016). Once the plaintiff meets his burden to demonstrate that his requested accommodation is facially reasonable, the burden then shifts to the defendant to rebut the reasonableness of the plaintiff's proposed accommodation. See id. This burden "is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship." Id. (internal alterations and quotation marks omitted). At that stage, a defendant has the opportunity to demonstrate that a proposed accommodation is unreasonable, because it would "fundamentally alter the nature of the service provided" or "impose an undue financial or administrative burden." See Henrietta D., 331 F.3d at 281.

Disability discrimination claims brought under the NYHRL are governed by the same standards. See Rodal v. Anesthesia Grp. of Onondaga, 369 F.3d 113, 117 n.1 (2d Cir. 2004).

**B. Analysis**

For purposes of his ADA claim, Plaintiff argues that he was denied the benefit of graduation from the Master's Program by reason of his disability. Specifically, he argues that in denying his requested extension past the July 15, 2014 deadline to submit his FPP, Defendants denied an accommodation that was reasonable and that was necessary in light of Plaintiff's diabetes and hypertension to ensure his acquisition of a master's degree. See Compl. at 12.

Defendants dispute that Plaintiff's physical impairments amount to a "disability," as defined in the ADA. See Defs.' Mem of Law at 14–17. But even assuming, *arguendo,* that Plaintiff has a qualifying disability, summary judgment is still warranted, because based on the undisputed evidence, Plaintiff's requested accommodation was not reasonable. See Henrietta D.,

17

331 F.3d at 280.

Plaintiff's accommodation request cannot be considered in isolation, but rather must be considered as the last straw in a four-year administrative headache for Defendants, during which they repeatedly granted Plaintiff's accommodation requests, in many instances without any indication that Plaintiff's disability required the accommodation. Based on the voluminous documentary evidence Defendants present, whose authenticity Plaintiff does not contest, Plaintiff  was unable to satisfy course requirements for Modes of Inquiry after numerous attempts over a four-year period, because he repeatedly missed deadlines, failed to complete assignments, and failed to adhere to requirements for the FPP assignment,[5] largely without explanation, let alone any disability-related explanation.

With the exception of Plaintiff's failure to meet the July 15, 2014 deadline to submit his FPP, Plaintiff does not even assert that any of his prior failings to timely complete required course work were related to his hypertension or diabetes, let alone support any such claim with evidence. Throughout his years of correspondence with Russell, aside from making occasional vague allusions to being "sick" or "not feeling well," while misleadingly implying that Plaintiff's settlement with the University authorized automatic extensions for all assignments based on his disability, Plaintiff often relied on intimidation rather than reason, demanding extensions of time

---

[5] The Court owes deference to Defendants' determinations that Plaintiff's assignments did not satisfy academic standards. See Doe v. New York University, 666 F.2d 761, 774 (2d Cir. 1981) ("[C]onsiderable deference must be paid to the evaluation made by the institution itself, absent proof that its standards and its application of them serve no purpose other than to deny an education to handicapped persons."); Regents of Univ. of Mich. v. Ewing, 474 U.S. 214, 225 (1985) ("When judges are asked to review the substance of a genuinely academic decision, they should show great respect for the faculty's judgment . . . [and] may not override it unless it is such a departure from accepted academic norms . . . .").

to complete assignments and threatening litigation should Russell fail to comply. And in every case, Russell granted Plaintiff an extension, after which Plaintiff still failed to complete assigned course work, again without any explanation related to his hypertension or diabetes. Plaintiff appears to concede that the length of these extensions would have been sufficient to reasonably accommodate his disability. See Saunders Dep. II at 63–64 (stating that an extension of one to three weeks is sufficient). Ryan, for her part, permitted Plaintiff to delay past the six-year graduation time limit, also despite the absence of any disability-related explanation. In other words, Defendants in fact gave Plaintiff a reasonable accommodation, and more, by granting him extensions past the end of the term each time he took Modes of Inquiry, which required making multiple exceptions to rules governing "incomplete" grades, and by extending his time to graduate, despite the six-year graduation rule. Under the circumstances, Defendants were not required to do more, at even greater administrative burden. See Diaz v. Lehman College, No. 95-CV-3220, 1998 U.S. Dist. LEXIS 396, at *15 (S.D.N.Y. Jan. 12, 1998) (granting summary judgment on a reasonable accommodation claim against defendant-university when plaintiff was unable to maintain the 2.0 GPA required for retention despite consistently being granted reasonable accommodations over a four-year period); Anyan v. N.Y. Life Ins. Co., 192 F. Supp. 2d 228, 247 (S.D.N.Y. 2002) (granting summary judgment on a reasonable accommodation claim when defendant-employer terminated a plaintiff with diabetes for failing to meet production quotas, after granting him extensions of time to meet quotas for three years despite the absence of valid accommodation requests).

And even with respect to Defendants' discrete act of denying the July 2014 extension request, there is no genuine dispute as to whether the requested accommodation was even

facially reasonable. While the Court grants Plaintiff the favorable inference that his doctor's note is authentic, the Court cannot deny summary judgment simply on the basis of this doctor's legal conclusion that a month-long extension was a reasonable accommodation. See Cutler v. Hamden Bd. of Educ., 150 F. Supp. 2d 356, 359 (D. Conn. 2001) (in ascertaining whether plaintiff had a qualifying disability, declining to rely on a note from plaintiff's doctor opining that her impairment "substantially limits a major life activity," because "the doctor's legal conclusion d[id] not provide any factual evidence that plaintiff is substantially limited in the major life activity of working"). The note, which simply asserts that Plaintiff required this extension, does not state what medical complication occurred in July 2014, let alone why that medical event necessitated the requested extension. See Russell Aff., Ex. 29. Plaintiff himself asserts, without citing to a sworn statement or other competent evidence, that he visited this doctor after "experiencing double vision because of []hypertension." Compl. at 12. In his deposition, he stated that he visited the doctor due to his "regular hypertension and diabetes." See Saunders Dep. III at 103. But he has never explained the why he believes this episode justified a month-long extension, even in unsworn assertions. And given that he was only a few days away from his extended deadline to submit the FPP, it is not apparent that his temporary incapacitation would justify an additional month to complete the assignment. On the basis of this evidence, he cannot meet even his "light" initial burden to show facial reasonableness. See Wright v. New York State Dep't of Corr., 831 F.3d 64, 76 (2d Cir. 2016).

Accordingly, summary judgment is granted as to Plaintiff's ADA claim. And because the Court has dismissed Plaintiff's only federal claim, the Court declines to exercise supplemental jurisdiction over his NYHRL claim. See Walker v. Time Life Films, Inc., 784 F.2d 44, 53 (2d Cir.

1986) (noting that "federal courts, absent exceptional circumstances, should abstain from exercising pendent jurisdiction when federal claims in a case can be disposed of by summary judgment").

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' motion for summary judgment (Dkt. No. 50) is **GRANTED** in its entirety; and it is further

**ORDERED**, that the Clerk shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:          February 03, 2021
                    Albany, New York


Lawrence E. Kahn
U.S. District Judge

21